We'll hear argument first this morning in Case 16-1363, Nielsen, Secretary of Homeland Security v. Preap. Mr. Tripp. Mr. Chief Justice, and may it please the Court, a criminal alien does not become exempt from mandatory detention by the happenstance that DHS did not arrest them immediately or promptly after they got out of jail or prison. And the best way to illustrate this point is just to look at the statutory text. And the key provision we're talking about here is 1226C2. This is the prohibition against releasing a detained criminal alien. And this is on page 4 of our merits brief. And what it says is that the Secretary may release an alien described in paragraph 1 only if it is for witness protection. And it's undisputed here that the witness protection exception does not apply and that this categorically prohibits the release on bond of anybody who is an alien described in paragraph 1. So then the question is, who are those aliens? And on paragraph 1, it's on the prior page, and it just answers that in no uncertain terms. It says, The Secretary shall take into custody, quote, any alien who is inadmissible or is deportable under these different provisions that relate to their criminal history or terrorist activities. And so an alien described in paragraph 1 is any alien who is inadmissible or is deportable under one of these provisions. And the next part of the statute Sotomayor, what meaning do you give to when the alien is released? Does it command you to do anything? Yeah. The key function of that, so, is to tell the Secretary when to act, right? So it's a line flush left, along with the command that the Secretary shall So you don't see any sense of urgency in your acting? No sense of encouraging you Oh, no. in some way to actually do what the statute says, which is take custody of someone? We absolutely think that this conveys a sense of urgency, and I think we're in full agreement with Respondents that this is directing, that this is an urgent priority. It's a mandate, you know, and it kicks in. It is triggered as soon as the alien is released. Our key point is that the phrase, when the alien is released So tell me, why would you have need transition rules under your reading of this statute, which there were? And the transition rules said you have two years, essentially, to put in place enough personnel and facilities to do what the statute requires you to do. Why did you need that two-year period if, in your view, you have absolute discretion to pick an alien up whenever you wanted to anyway? I think that's really not a fair characterization of our position. Our understanding is that this is a mandate. It is triggered immediately. In a very large number of cases, the arrest is going to occur immediately. This is a mandate, and this statute was going to direct that many more aliens be arrested. And so under our stand – you know, and the real concern with the transition period rules was a lack of bed space, and under both of our interpretations, this is going to drive up the number of aliens who are arrested. No, no, no. But why did you need the transition rules at all? If you have discretion, as you claim to have, to decide when you're going to pick up an alien, either the day of release or, in one case before us, 11 years later, you didn't need the transition rules. You could have just done what you needed to do to create the bed space or get the personnel and start arresting people when you thought you could. But again, I want to be clear, we don't interpret this to say that we can arrest the person whenever we want. We understand this to be a continuing, urgent obligation to arrest them right now. We need to arrest them when they get out. We need to arrest them the next day, the next month, whenever it happens. But, you know, sometimes it may not occur for years because DHS doesn't know where the person is. Sotomayor, let's go to the release provision. Right. Paragraph 1 is an entire paragraph. It describes a type of alien and an alien who's picked up at a particular time. So if the statute intended this lack of authority to kick in if the alien only met A through D, why doesn't the statute say that? Why doesn't it say paragraph 1, A through D? A couple of responses. I think those are the only portions of the statute that describe, that actually describe the alien. The phrase, when the alien is released, doesn't describe him. It takes as a given that he's already been fully described. Sotomayor, it describes the type of alien we're talking about. I don't think the person who's subject to this provision. I don't think that's right because it says when – that might be right if it said something like the Secretary shall take into custody any alien who is inadmissible and deportable, you know, and who has not been released for more than such and such amount of time, but that's not what it says. It says when the alien is released, which I think takes as a given that he's already been fully described. But another, I think, important answer to this is the text of 1226A, which I'd also like to walk through. Their basic theory is that these arrests are happening under A. I don't think they're right about that, but even if they were, they would still lose. So under – this is in the PET app, actually, at 141A. And 1226A, this is the background rule. And it has, like C, it has these two sentences. The first is about arrest and the second is about custody. And the first sentence says, on a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether he is to be removed. And so what C-1 does is it takes that discretionary authority and it turns it into a mandate to the Secretary that she shall arrest these certain criminal aliens. Ginsburg-McGillivray-Dries-Splitt Mr. Tripp, it's your position, then, it is totally irrelevant whether the change in custody is immediate or it's 7 years down the road. Whenever it occurs, the Attorney General has no discretion to have a bond hearing. Whenever it occurs, 7 years, 8 years, 10 years, the person is detained without bond, right? Tripp Yes, that's absolutely our understanding of C-2, yes. Alito Among those lines, Mr. Tripp, does the government have any view about if ever the obligation under C lapses? Could it be 30 years? Could it be the obligation to take into custody under C-1, 30 years and the government was aware of them the entire time and chose not to act, kind of a latches argument? Is there any limit on the government's power? Tripp So we understand that C-1 to be a continuing obligation does not lapse. But if I could just follow through with the text of A and just how this supports us on the custody determination, I think it would be helpful. So there's this first discretionary authority to arrest the alien and then the next sentence talks about what do you do after he's been arrested. And what it says is, except as provided in subsection C of this section and pending such decision, the Secretary either may continue to detain him or may release him on bond. But of course what C says is you can't release him at all. Kagan Just to think about how these two provisions interact with each other, I'm wondering if you can tell me with respect to a group of people who are not involved here. As I understand it, these A through D categories include some people who have never been in criminal custody at all. So let's take spouses or children of terrorists. But there are a number of categories of people who have never been in custody at all. Tripp Right. Kagan So they fit within this A through D category. I'm wondering where you think the authority to detain them comes from. Does the authority to detain them come from C or does it come from A? Tripp The authority to so I think actually for all of them, the authority to do the arrest comes from A. And but what happens with C is C-1 makes the arrest mandatory. And we do think it makes it mandatory, including for those people who have never been in custody at all, that the when the alien is released describes when the duty is triggered, but there are some aliens, in particular with the C-1D category that you're talking about, the national security terrorist ones where the person has never been in any prior custody. But again, it really ultimately doesn't matter. Kagan Well, it sort of matters to me, I think. You know, you could be saying, if I understand your view of described in paragraph one, these aliens are described in paragraph one, even though they've never been in criminal custody. Tripp That's right. Kagan So that would suggest that C-1 is authorizing their detention. And that's what you're saying. Tripp No, sorry. Well, C-1 is about arrest, just like the first sentence of A is about arrest. Kagan Yeah. How are you arresting these people? Are you arresting them under C-1? Tripp I think, actually, frankly, the answer is that we're arresting under both A and C-1. You know, the arrests, they have to be upon a warrant. That requirement comes from A. This all of this is pending a determination of whether the alien is to be removed. Kagan Well, when you say you're arresting them under both, are you saying that with respect to everybody under C-1, you're also arresting them under A? Okay, so that I'm not interested in. You know, that kind of, you're saying that those people are under C-1 to the same extent as people who have been in criminal custody. Tripp That's right. Kagan So that seems odd to me, because C-1 seems to me all about people who have been in criminal custody. Now, you have this question about how about if there's a gap between the criminal custody, but your interpretation necessitates that you understand even people who have never been in criminal custody as part of the C-1 group. Tripp That's right. I think just one thing I would point out is in the overwhelming majority of applications of this statute, this is, I think, still totally sensible, because in the overwhelming majority of applications, the person is about criminal, and in all of the criminal ones, there's going to have been some prior criminal custody, and so that's, I think, really the paradigm of the statute. Kagan Yes, this is a small group relatively, but it's definitely a group. There are quite a number of subcategories that have never been in criminal custody here, and we could go over what they are if anybody's interested, but there are a number. And your statutory interpretation, particularly your narrow view of the term described in paragraph 1, requires that those people be understood as within the C-1 custody authority, and I don't know. I look at the C-1 custody authority, and it's all about criminal custody and what happens when you're released from criminal custody, and that makes me think that your interpretation of the words described in paragraph 1 is wrong. Tripp I think it's more that you may disagree about whether the duty to erase, the duty to arrest them in C-1 kicks in when an alien has not been in prior criminal custody, some prior State or Federal criminal custody, but even if you disagree with us on that, so first of all, all of the Respondents here have been in some prior custody, and of course, what we're really saying is that, you know, the timing of their arrest, the timing of their release is just – is totally irrelevant when it comes to C-2, and I think what the first part. Breyer What about the first part? I mean, we've read the briefs. You've read them. It seemed to me reading them that people here have been detained for 11 years. 14 years. I mean, they were arrested. 14 years after being released, and one for taking bus transfers. He had been arrested and put on probation or something for stealing bus transfers. Well, all you have to do is read the briefs. To me, I'm not saying to you, that isn't a parade of possible future horribles. Those are the horribles. Every person in the United States, just about, if he's arrested, has the right to a bail hearing. As you know from my opinion in Jennings, I think that's unconstitutional. But the Court didn't decide the contrary. All right? So assume, as I am assuming, that this paragraph is ambiguous at most in your favor. And if it's ambiguous, and if there is a huge, as I think, a huge constitutional question, then don't reread it not to apply, or to apply to those who have been properly released. I take it you don't think the government could come back 50 years later and arrest somebody who's a grandfather, or something, you know, he stole some bus transfers 50 years earlier. Is that what you think Sewell authorizes? So a couple of responses to that. So first, of course, our top-line answer is that this statute is not ambiguous, that the only plausible reading is in light. So you think a person 50 years later who is on his deathbed, after stealing some bus transfers, this paragraph says that the Attorney General shall release him and hold him without bail, even though in this country a triple-axe murderer is given bail. I hear it. I hear it. So a couple more answers to that. So first, I don't think that hypothetical would hold out. Theft can be a crime involving moral turpitude, but both the deportability and admissibility provisions on crimes involving moral turpitude. So if you look at, for deportable aliens, this is under 1226c1c. Breyer's question is my question, and I really wish you'd answer it. We can quibble over what constitutes a crime of moral turpitude, but they're legion. They're legion. And whether it's a bus transfer or whatever hypothetical, it doesn't matter. All right? 50 years later, a minor crime, you say, yes, the government must come and arrest him, right? So I'm not trying to quibble over what's a crime involving moral turpitude. I'm saying that there's a sentence requirement under the statute. The government's position that this paragraph, which says she'll be arrested upon release, applies to a person who has been released 50 years before. What is your position? I'm not even criticizing it, but I was. Our position is absolutely that this applies regardless of the time in. This statute went into effect in 1998.  So we're not looking at that yet. So your position is, yes, he's 50 years old. To get into the constitutional question. Breyer. Let me ask another question, please, because I have the answer now what your position is. Okay. Now, my second question is this. There is support for your position in the cases. And the cases that support it, I thought, were the cases that says when the government misses a bail deadline, then you can go ahead and have the bail hearing anyway. When there's a bail deadline missed, because that's not really said about what happens when you miss the bail deadline, and the same is true here. That's right. Now, that I thought was your strong, to me, the strongest argument. Right. So I thought then, and this is my question, I thought then, is this like those cases? And the answer, I thought, was, well, yes, in the sense that there is a, no statement of what happens when you miss the deadline, A, right there, and B, the government once says, all right, A is good enough. But there is a big difference. In the bail cases, the result of missing the deadline, the result of reading in no deadline, is you're going to have a bail hearing, the community will be protected, right? The community will be protected with a bail hearing, and the individual will not be hurt much, because all he'd be missing is a hearing that he should have had anyway. But in this case, if you read the statute the same way, what you're doing to the individual is many who are no danger to the community, no danger to the community. You're depriving them of a hearing that could mean their release, and you're keeping them instead for 11, 12, 13, 14 years. And what you're doing to the community, reading it your way, if we read it the opposite way, nothing. You'll have the bail hearing. The dangerous people won't get out. So I thought in terms of the purposes, are you following what I'm saying? You see, in terms of the purposes of the bail statute, or this statute, or any other And we hurt everybody in terms of the purposes. We read it the opposite way, and we hurt virtually nobody. And this is the piece I want to push back on hard. I think this is the Montalvo-Murillo, these better late than never cases, I think, are squarely on point for our understanding of C-1. And the key point, as you said, is that, you know, well, a couple things. One is, you know, what is the authority that you would lose? The authority we would lose is C-2, the authority to hold them without a bail hearing. And the whole point of this statute is to stop doing bail hearings on the ground – on the traditional bail factors of flight risk and recidivism. That's the entire point. Congress looked at this issue. They worked with it for years and years and years. And I think basically at the end of the day, Congress's answer was enough is enough. If you're an alien, you come here, you commit one of these crimes, you've effectively forfeited whatever right you have to remain at large in the community. And so to be looking back at the bail factors is to defeat the purpose of the statute. And we have two, I think, very powerful examples here, just among the named plaintiffs, right? We have Mr. – so Mr. Monet Priap, he was out for seven years, and then he was rearrested for a domestic abuse charge, which he pleaded down to battery. We have Mr. Rodriguez-Moya. Ginsburg. And yet he got cancellation of removal, didn't he? He did get cancellation of removal. But then we have Mr. Rodriguez-Moya, who was out for three years. He got a bond hearing, he was released, and he attempted to murder his ex-girlfriend and succeeded in murdering her new boyfriend. Mr. Tripp, what is the definition of the class that was certified by the district court? Does it consist of solely of people who have been – who were released from criminal custody many years ago? No, not even close. It's any criminal alien who is not arrested immediately. So there's an extraordinary mismatch between the kinds of claims that I think Respondents are getting at. These are sort of long, long-term ones in what we're talking about here. And I think really what those – Do you have any sense, understanding, even estimate of the – in the whole class, how many people are people who were detained a day later? How many people were, you know, were detained a year plus later? Yeah. So I think the short answer is we really don't know. There's nothing in the record on that, and there aren't any published statistics on this either. I think one thing that might help is if I could just take a step back and explain the many reasons why gaps in custody can occur and why they're often fairly long. So first, in order to arrest an alien under one of these provisions, DHS, of course, first needs to know that the person is actually an alien and that they've actually committed one of these crimes. And in many cases, that's going to take, like, real legwork by DHS officers on the ground, pulling the records of conviction, looking to see the statute, comparing the elements of the statute to the elements of the generic offense. And I think, as the Court is painfully aware, that can be difficult and time-consuming. And then even when we're saying a reasonable time, the word, the words that we know are there, upon his release, means a reasonable time within his release, you know, a reasonable time. Therefore, the people who have been hiding in the mountains for 10 years, they say, well, yeah, that's a reasonable time. But the people who have families and have jobs and have lived as citizens of the community for 14 years, that was not a reasonable time when you went 14 years later. What about that typical legal term in order to satisfy what the government says, as you say, is its major interest? So I think a couple of responses. So first, C-2 doesn't have a timing requirement at all, and that's the statute that we are relying on. And I think, second, what you're really getting at, and I think the force of what you're saying, is that it feels different when the alien's been out for a really, really long period of time. And I think what that's getting at is I think that it would have been perfectly rational for Congress to add a statute of limitations here, to say something in C-2, like an alien may be released only if it's for witness protection or if the person has been out for 10 years and hasn't gotten into trouble and is potentially eligible for this. Kagan, are you saying, Mr. Tripp, that there's no constitutional claim as to any of these people, even if a person has been out for 15 years, has established ties in the community? Are you saying that there's no constitutional problem with that? Tripp So, I mean, we certainly don't think there's a substantial constitutional problem that they've identified. I mean, Damore v. Kim squarely upheld this statute. They are not asking the Court to overrule Damore. They're not saying that it's wrongly decided. Their only argument is that Damore only applies if the person was arrested within a day of when they were released. Kagan Well, that's what I'm saying. That's what I'm saying. I mean, assume that this class were made up of people who hadn't – who had lived after release from criminal custody for a very substantial period of time, whatever it is, 5 years, 10 years, 15 years. Would they have constitutional – serious constitutional claims in your view? Tripp I think the answer is no under the analysis in Damore. So, first of all, when a criminal alien is finally put into removal proceedings, they know this is happening. They've been arrested, all of that. The incentive to flee is not insubstantial. Their criminal conviction is almost always going to establish that they are removable, and they're often going to be ineligible for any kind of relief. So, they're not going to look for – Ginsburg Would you explain, then, why Preop himself was eligible for relief? Tripp Because not all – only some criminal aliens and more LPRs have – have eligibility for relief. If you're not an LPR, the barrier is much broader. But also, I think, again, I think even just the facts of this case show that the danger of recidivism does not disappear after the process of some number of years. Breyer Look, will you do me one favor? First, assume I'm right, which I know is a heroic assumption. But assume that there's a constitutional problem in a country which gives every triple-axe murderer a bail hearing, but these people don't, okay? All you're involved is a bail hearing. Now, assume another thing with me, which you don't want to, that the statute is ambiguous. Now, if I'm right on those two things, why would the government really care? Why does the government care? Why wouldn't it want to say, okay, we'll give them a bail hearing? The baddies will be in jail, and the ones who are no risk won't be. Tripp I think the real concern is really what Congress was getting at here is that making this prediction of which criminal aliens are going to flee and which are going to reoffend is actually really, really hard, right? And I think, you know, the example of Mr. Rodriguez-Moya, I think, drives that home, you know, that when IJs were doing this with the criminal alien in front of them on the basis of the traditional bail factors, Congress's basic judgment was that too many of them were going to be released and that it actually wasn't working. And so Congress, you know, they experimented with this. That was the rule for many decades until Congress started narrowing down and building out these statutes with mandatory detention. Alitoson Well, Mr. Tripp, you've been pushed on the fall within the statute would have a constitutional right to a bail hearing. But I thought the question that we agreed to decide related to what the Ninth Circuit saw as a requirement that the alien, that Homeland Security take the alien into custody immediately. And that was the class of aliens that was certified by the district court. So if we were to reverse that determination, would that preclude a challenge by an individual challenge, an as-applied challenge by an alien who fell within the circumstances that have been described? Tripp No, of course not. That safety valve is always available. And I think it's, frankly, much, much more faithful to what Congress was trying to accomplish here. Kagan And do you agree that an alien could bring that challenge, notwithstanding 1226e? So 1226e, right, is the jurisdictional provision. Does that at all prevent an alien from bringing the kind of challenge that Justice Alito was talking about? Tripp I think our understanding is no, actually. Aliens bring these kinds of claims in the prolonged detention context with some frequency. If I could reserve the balance of my time. Roberts Thank you, counsel. Ms. Wang. Ms. Wang Mr. Chief Justice, and may it please the Court, the government's reading is contrary to the text, structure, and purpose of the statute in at least three ways. One, it negates Congress's directive to use finite mandatory detention resources on those who would otherwise be released into the community from criminal custody. Second, it's not true that Congress wanted to detain and deport all criminal aliens, as the government claims in its reply brief at page 12. And three, if Congress really wanted what the executive branch claims here, it would have simply written a statute that says people in these four categories shall be detained without a hearing until removed. That is not what Congress did. Instead, Congress wrote a statute, 1226C, as an exception to the general detention scheme in 1226A, which applies except as provided in subsection C, not as except as provided in section C-2, as the government would have it. Congress wrote section 1226C in two paragraphs. The first paragraph says who gets taken into custody and when. And the second paragraph says of those people in paragraph 1, who can be released. Now, the government claims instead, in a stretch of a reading, that you focus only on paragraphs A through D in paragraph 1. In other words, they say section C-2 stands alone as an authorization for mandatory detention. But that's not what Congress said. It said except as an alien described in paragraph 1, not an alien described in paragraph 1A through D. And the government's reading, trying to pull section 2, C-2, out as that freestanding authorization, leads to three serious anomalies that they struggle to explain, as they did with you, Justice Kagan. The first anomaly is, as you noted, that the transition rules, which were meant to be a ramp-up to the permanent rule, are completely superfluous. If the government really could delay, for whatever reason, picking up people subject to mandatory detention for as long as it needs or wants, then Congress would not need to have that intermediate step. The second anomaly with the government's reading is, and the government struggled with this in response, again, to your questions, Justice Kagan, is that if the only qualification to be subject to mandatory detention is that you fall into one of the four categories in A through D, they necessarily read out the prior criminal custody requirement. In addition to the example you gave, Justice Kagan, of a child or a spouse of a terrorist, there's a very typical situation. I'm an immigrant. I show up for my green card interview, and I live in California or Washington, and I confidently say, yes, I use marijuana on a regular basis. I've never been arrested. I've never been convicted of a controlled substance offense. But based on my admission to possession of a controlled substance, I might then be subject to mandatory detention on the spot as I sit there in a CIS office under the government's reading. Now, the government acknowledges that eliminating a prior criminal custody requirement would be anomalous. And they do find, they do acknowledge there's a prior criminal custody requirement. But instead of finding that in the natural and obvious place within the four corners of this statute, that is, as Justice Sotomayor pointed out, the phrase, when the alien is released, they go hunting around back to the uncodified effective date provision for Section 1226C, which says it applies to aliens released after October 8, 1998. That leads to a further anomaly, the third anomaly, which, as Judge Barron explained in his opinion in Castaneda 810F3rd at 29, that the transition period rule, again, which was meant to be an intermediate step up, is less broad – excuse me – is broader than the permanent rule in Section 1226C. Just when there's another anomaly, maybe you can explain it to me, let's take two people, identical crimes, one of the ones in A through D. One of them gets picked up immediately and no bail hearing. The other doesn't get picked up until two years later, bail hearing. As far as the alien is concerned, these two are identically situated, and yet one gets the benefit of a bail hearing and the other doesn't. Why does that make sense? O'Connell. Your Honor, well, the person who is detained immediately falls under Congress's scheme. Congress provided that if you're within categories A through D and you are taken into custody when you're released from your criminal custody and you aren't needed for witness protection purposes, mandatory detention. But suppose I'm the alien in the category that's picked up immediately, and I ask you, explain to me why I don't get a hearing and yet someone who had the benefit of being out for two years, three years, does get a hearing. My first response to you, Justice Ginsburg, would be that's what the statute provides. And the second response is that the Court decided in DeMoor in 2003 that applying the mandatory detention rule, at least not considering the question before the Court now, is constitutional. And that brings me, I think, to the question about constitutional avoidance that you brought up, Justice Breyer, that when Congress, there are two reasons. The government says better late than never. There are lots of reasons why this Congress did not want better late than never. The first is the text in the structure of the statute, which indicate if the person is not taken into custody when they're released from criminal custody by ICE, then they're under 1226a and you get a hearing. Alito, what do you think when means? Does it mean immediately? Does when mean immediately? Yes, Your Honor, and we would ask the Court to affirm. Immediately, so as soon as the person is – walks out of the door of the prison or the jail, if ICE doesn't take the person into custody at that point, that's the end of it? No, Your Honor. We would ask the Court to affirm the Ninth Circuit, which said that a reasonable degree of immediacy is appropriate. What does a reasonable degree of immediacy mean? I mean, let's – I don't know how many people will be released from criminal custody today in, let's say, the State of California, but I'm sure there are dozens, probably hundreds, I don't know, a lot. How is the Federal Government going to be able to determine quickly, within 48 hours or any short period of time, whether those individuals would be subject to the mandatory detention requirement of this statute? California is not going to tell the Federal Government, look, we're releasing this person and this person is an alien, not a citizen, and this is what the person was convicted of. How are they supposed to do that? Congress provided for how they would do that, Justice Alito. Congress was thinking about State and local cooperation at the same time they were enacting Section 1226C, and what they did was set up mechanisms for State and local cooperation with Federal authorities through statutes, through Section 1226D, an adjacent provision, through 1257G, also known colloquially as 287G agreements, and through 1373, all in Title VIII. The major innovation that Congress wanted and got during that same time frame as the Senate report, 10448, at pages 15 to 16, an automated fingerprint system. So Congress, when it was writing Section 1226C, knew that they didn't have in place all the pieces needed for this mechanism to work, but they were putting other statutes there. Alito So the first part of your answer is that the State, the State governments, the municipal governments are going to provide this information to the Department of Homeland Security? O'Connell That is what Congress anticipated when it wrote this statute in 1996, yes. Alito And is that what is happening now? O'Connell Your Honor, it's largely what is happening now. The government cites some data from 1996. There's also data we've cited that show that in fiscal years 15 through 17, 94 percent of Federal requests to State and local jurisdictions were complied with. But I think the larger point, Justice Alito, is that Congress, we have to read what Congress wanted in 1996. And whatever is happening today with controversies over so-called sanctuary jurisdictions don't really shed light on what Congress wanted in 96. What does shed light on what Congress wanted in 96 is what they actually enacted. Alito Yes, and what they enacted was a provision that says, the Attorney General now, the Secretary shall take into custody any alien who satisfies certain requirements when the alien is released. O'Connell Yes, Your Honor, and to the extent Congress was thinking about State and local cooperation, they dealt with that through the other three statutes I mentioned and through automated fingerprinting and communication between Feds and State and local jurisdictions. I note finally, Justice Alito, that the Court dealt with similar parallel arguments by the government in the Pereira and Moncrief cases, and the Court said, look, the government can point to these practical considerations, but at the end of the day, we're looking at the words that Congress wrote, and the practical considerations that pertain in the current environment in 19 — sorry, 2018 don't really shed light. Alito But we have to decide whether when the alien is released means, as you say, as the Ninth Circuit said, immediately, within 48 hours, within some reasonable period, or after the alien is released. In simple terms, that's the question before us, right? O'Connell Yes, Your Honor, and to answer your question, I believe the Court should affirm the Ninth Circuit, which again said the government should act, shall take the alien into custody with a reasonable degree of immediacy. Now, I note that the BIA, the Board of Immigration Appeals in Rojas, said 48 hours is outside that time limit. We think the same day would be appropriate. We don't think if ICE shows up to pick someone up on their release date and they date, I think that suffices, and I think that's right. Breyer Wrong with when a — a reasonable time has been in the law since Lord Cook. I mean, and courts have managed to deal with it. So why wouldn't we avoid these problems if we just say, when they say on release, you say a reasonable time? O'Connell That's exactly right, Justice Breyer. Breyer I'm not sure the Ninth Circuit said that. Roberts Well, I mean, there's a difference between reasonable degree of immediacy and reasonable time. I don't see how immediate is immediate. You can't have a reasonable degree of immediacy. If it's an hour later, it's not immediate. Now, which are you arguing for? Reasonable degree of immediacy, which strikes me as a very short time, or a reasonable time? Reasonable time would depend, for example, on the resources that are available to the Department of Homeland Security. It's not reasonable to — if they don't have enough people to do it. If it takes a week, if it takes — I don't know what's reasonable in this situation, a month. But a reasonable degree of immediacy is something else. That strikes me as a half hour or something, because otherwise it's not immediate. So which is it? Reasonable degree of immediacy or reasonable time? O'Connell Your Honor, I think that the Ninth Circuit was using the phrase reasonable with respect to a temporal scope, not with respect to whether the government was making reasonable efforts or acting in good faith. The statute says when, which, as the BIA acknowledged, connotes immediacy. Roberts Yeah, but as Judge Chiara pointed out in his opinion, when could be, you know, if you're saying it's not immediate, then who knows? Maybe it's a year, maybe it's six months. O'Connell Well, Your Honor, I think it would certainly not be in any sense of the word when released, when the alien is released. A year would not suffice. I think, Justice Breyer — Roberts Okay. Well, can you give me a time? O'Connell Sure. I think the same day would be fine, Your Honor. And as I noted, the BIA said in the Rojas case, which the government asked the Court to defer to, that 48 hours is not within the scope of the when the alien is released. Roberts Okay. So it seems to me that reasonable time isn't really giving any flexibility to the statute if you say it has to be 48 hours. O'Connell Your Honor, we think 48 hours is too long, as Rojas said. If the Court — Roberts Okay. So you think it's the same day? O'Connell We think it's the same day, Your Honor. If the Court — I think just to get to Justice Breyer's question, there's no doubt — and again, the government accuses us of cherry-picking cases in which the gap was long. In fact, the data the government has provided in the companion case or the parallel case of Gordon in the First Circuit shows that years' delay is the mine run of cases. That data shows that the average delay between criminal custody release and ICE picking the person up is 3 years. Roberts Why don't you — Kagan In your class, how many people have been — what percentage of the class has been out for, let's say, let's just call it a year plus? O'Connell Justice Kagan, we didn't get discovery in this case. That's before the Court. We only have the discovery in the Gordon case in the First Circuit. So I unfortunately don't have the numbers for this. Sotomayor Ms. Wang — Sotomayor What was the answer on that case? O'Connell In Gordon, the average delay was 3 years. The median delay was 13 months. Sotomayor In that class? O'Connell In that class, correct, in the Gordon case. And that was, again, based on data the government provided us. Sotomayor Ms. Wang, let's assume a situation, hypothetical. The government goes to the jail that day. They're told the prisoner's going to get out at 10 in the morning, but he gets out at 7. They then go looking for him, and he's now gone underground, never shows up at the parole office, never talks to family or friends. They look for him periodically over a period of time, and all of a sudden he's re-arrested. Do you see that as a different reasonable time situation than what happens here, which is that the government, for example, I understand from the briefs, that sometimes they put in a detainer and don't even bother to show up? O'Connell That's right, Justice Sotomayor. Sotomayor So if there is a difference, why are we marking a temporal limit on what reasonable effort to comply with the statute might mean? It seems to me, Justice Breyer is right, that the law is filled with the reasonable effort to comply with the terms of a command. But I don't see how we can set a temporal limit to that reasonable effort in the way that you're promoting. I think you can, Justice Sotomayor, because again, I'm trying to stay true to the words Congress wrote. Congress used the phrase, when the alien is released, which clearly, as everyone acknowledges, has a temporal component. They didn't write a statute that pegged mandatory detention to some kind of good faith or reasonable effort standard for the government. And just to give a counterexample, let's say the government, and I want to say first, I agree with you, the record here, the amicus brief filed by the Advancement Project and other civil rights groups, shows most of these people who are picked up years later, like Mr. Santos Cid Rodriguez, who was detained many years after he was released from criminal custody at home. These people are being picked up, as Judge Kleinfeld in the Ninth Circuit noted during oral argument, in front of their house, mowing the lawn at the job, sometimes in an interview that they voluntarily appear for with the agency. So it's not a case where the government is, you know, dealing with someone who's a fugitive, who's trying to hide. But to get back to your question, I'm sorry. Roberts. Oh, no, if you go ahead and finish, I've got a question after. I'll quickly just get to the chase. So, Justice Sotomayor, I think the statute Congress wrote speaks in temporal terms. And if the government, for whatever reason, doesn't take custody when the alien is released, we think same day is fine, then the person gets a hearing under Subsection A, and that's the only consequence, as Justice Breyer noted. Okay. You've hinged a lot on the language, and you've told us to ignore what's happened after 1996, and in response to Justice Sotomayor, went back to that language when the alien is released. But if we're going to focus really carefully on the language, what do we do about the fact that that is an adverbial phrase? And you're asking us to suggest that it modifies the noun alien and limits the class of aliens that are involved. Alien's a noun. Adverbs don't usually modify nouns. They usually modify verbs. And the verb here is shall take into custody. So why isn't it that the duty shall take into custody is modified by the adverb when the alien is released? Okay. And so the government's obligation begins at that moment. We know that's when the shall take into custody duty starts. But the class of aliens, the who, the noun, has nothing to do with the adverb. Now, that's the question my fifth grade grammar teacher had. All right. And so I pose it to you. Well, I think I'm a grammarian, too. The reason why, Justice Gorsuch, is that sometimes adverbial phrases do describe a noun, just as they do in this statute. So first, for all the reasons I've already said. Usually they modify the verb. So let's start there. I will concede that. Why should we, you're asking us to take a rather unusual view of grammar. One I think I'd have to delve pretty deep in the footnotes to find. It wouldn't be. So why would I do that? It wouldn't be the first time Congress tortured grammar, but. This I cannot argue with you about. Right. So two reasons, Justice Gorsuch. For the reasons I've already said, I think it's clear from the structure of the statute and the plain language that Congress meant for people, for paragraph 2 to describe a subset of people who were taken into custody in paragraph 1, and all of paragraph 1, not omitting the flush language as my friend describes it. The second reason is, yes, it may be uncommon for an adverbial phrase to describe a noun, but it can happen. Let me give you a hypothetical example that tracks this statute. I might tell you in a two-paragraph instruction, number 1, harvest the grapes in vineyards A, B, and C when they ripen. Paragraph 2, make the wine from the grapes described in paragraph 1. The grapes refer to both the temporal component, I want you to harvest them when they're ripe, not when they're overripe, not when they're underripe, and it's from those three vineyards. I'm not sure I, I mean, I follow the example, but I'm not sure I buy it. And let me tell you why. And it's a neat example. I commend you. Well done. I think, I think my fifth-grade grammar teacher would love this discussion. But I would say to you, or I challenge you with this, that again, there you're modifying the verb, when you're supposed to harvest it, okay? And that's the first, the first section. The second section, you're saying, okay, whatever you've harvested, the grapes that we've described, you have harvested, you still have to have harvested them. So it still depends upon the verb in that second paragraph, the verb plus the noun. So I'm not sure it gets around the problem. Help me out. I guess, Justice Gorsuch, I think another way to put this is that what the government's referring to as an adverbial phrase could be rephrased as an adjective. The hypothetical we gave in our brief about the red-headed man wearing the blue jacket when he arrives on the 3 o'clock train from New York, when he arrives on the 3 o'clock train from New York is really a characteristic of the man that's described. And the same way, Your Honor, that I think Congress in paragraph 2, again, by using the phrase an alien described in paragraph 1, not an alien described in paragraph 1a through d, I think it's simply the whole, the entirety of paragraph 1 describes the alien in that paragraph 2 phrase. And I think that's simply what Congress would have known or thought that it wasn't going to be immediate in many cases. Correct? Yes, Justice Kavanaugh. And the consequence... And yet Congress did not put in a time limit, whether it's reasonable time, as Justice Breyer says, or a year or two years or six months or 48 hours. And so when you combine those two points, Congress knew it wouldn't be immediate, and yet Congress did not put in a time limit, that raises a real question for me whether we should be superimposing a time limit into the statute when Congress, at least as I read it, did not itself do so. How do you respond to that? Well, Justice Kavanaugh, we're not asking you to superimpose a time limit. We're asking you to give meaning to all the words of the statute that Congress enacted, which say... But you're... I'm sorry to interrupt, but when you say when, you are saying that is, in essence, a time limit of immediate, same day, I think you said. And my point is, that's very odd when you think about what Congress was doing in 1996, because they were well aware that would not happen, A, because of resources, B, because they're not learning about it right away. And it would be odd to think, okay, that's what this statute means, even though it would often not be effectuated in that way. Well, Your Honor, I think, again, Congress, first, as Justice Breyer noted, Congress often will have kind of a soft target when they legislate in this way. Second, remember... A soft target would be what Justice Breyer might say, reasonable time, and Congress could have put that in, but, and maybe we should, Justice Breyer's idea, but Congress didn't do that. I think, Your Honor, that Congress, in saying when, meant what when means in the common sense, reasonable, within a reasonable time of the event happening. We go to the dictionary definition, as Judge Breyer noted... Well, can you follow up on the Chief Justice's point? Is reasonable immediacy as different from reasonable time, in your view? I think that the Ninth Circuit used reasonable degree of immediacy and promptly, interchangeably. And as the BIA, again, said, when connotes immediacy, as Judge Barron pointed out, when connotes immediacy, that's the primary dictionary definition. But I do want to say one other thing in response to you, Justice Kavanaugh, and that is, remember that subsection C, mandatory detention without any individual hearing, is written as an exception to subsection A. So the only consequence is, you get a hearing. And so, the bad ones, as Justice Breyer said, the baddies, will be detained, and I want to point out... The problem is that Congress did not trust those hearings for a certain class, is my understanding, and correct me if I'm wrong about that, but Congress was concerned that those hearings were not working in the way that Congress wanted, and therefore, for a certain class of criminal or terrorist, aliens said, no more. That's right, but the question here is, what's the class? What's the class? Congress wrote the statute to say, take them into custody when released. Otherwise, accept as provided in paragraph C, subsection C. And so the consequence of the hearing, and I wanted to point out that the bipartisan group of former INS and DHS general counsels said at page 10 of their brief, they agree with our reading of the statute, and they say detention under section 1226A is not meaningfully more burdensome for the government. Roberts Well, they might agree, but every other circuit, four of them, and an equally divided First Circuit, disagree. Well, some of the circuits, Your Honor, deferred to the BIA's reading, which the government is asking partly to defer to and partly not, since they disagree with the BIA's reading of paragraph 1, but not with paragraph 2, and for the Fourth Circuit actually read the Rojas decision incorrectly and deferred on the when-released ground. I think that the First Circuit panel and Judge Barron and the Ninth Circuit below got this right. That reading gives full meaning to every word in the statute. It makes sense of the two-paragraph structure and the fact that C is written as an exception to A. And I want to point out that at the time Congress wrote this statute, this Court had never before approved of civil detention, executive detention, without individualized hearings on flight risk and danger. And so the Court should – the Congress should be presumed to have written that provision narrowly. As the Ninth Circuit and Judge Barron pointed out, and I think as Judge Breyer was going to say and more, that the government can constitutionally apply a categorical and irrebuttable presumption. Is that presumption based on what we think was really going through Congress's mind at the time, or is it based on a constitutional overlay? Because what was really going through Congress's time in 1996 was harshness on this topic. Is that not right? Congress was certainly trying to deal with what they considered to be a problem with noncitizens who have committed crimes. The question again is, who were they targeting with this statute? And I think that the words that Congress chose are narrow ones. They clearly say that people had to be in criminal custody under these four grounds. And there's a serious constitutional problem if you buy the government's reading. My friend – Alitoson I can see the equities when the alien has been free for a number of years. But Congress, wisely or not, thought that this class of aliens was dangerous and they should not be trusted. Bail hearings were unreliable. So you would say that this statute requires their detention as soon as they get out. Now, if that's the case, and it obviously is, why would Congress think differently about someone who's been out for a week? For two reasons, Your Honor. The first is the legislative history, especially as outlined in the members of Congress' dark green brief, makes it clear Congress wanted ICE, then INS, to focus limited capacity, limited capacity to detain on people already in criminal custody who would otherwise be released. They said, in other words, don't spread yourself thin. My friend said it takes more effort to go find people in the community. That's exactly right, and that's the problem Congress wanted to do. What would you think of – I see the problem of reasonable time, but DeMoor concerned a case where the Court thought that these people were detained without bail hearings for less than six months. Zadvitas interprets a silent statute to imply a six-month limitation on other, but related, holding of aliens. So what would you think of reading this statute in order, in my opinion, not to violate a principle that goes back to not the Magna Carta, at least to Blackstone, that we read this statute the same way? There it is. We have a degree of clarity. We say we use – we go to Zadvitas and we go to the history of bail, and we say, all right, six months. Your Honor, may I finish? Sure. Your Honor, I think that, Justice Breyer, the six months would be an extraordinary amount of time and just gets a little far afield from the words Congress chose. And I remind you that the Board of Immigration Appeals said 48 hours was too long. So if the Court wishes to draw a bright line, as you did in Zadvitas, I think that would be fine, but really we should follow the words Congress wrote. Thank you, Ms. Wang. Four minutes, Mr. Tripp. Thank you, Mr. Chief Justice. Thank you. Just a couple of points. The key question here is not the meaning of when. It's who are the aliens described in paragraph 1, and the answer is it's an alien, any alien with the requisite criminal history. The time in is really not relevant. Sotomayor's question, because they didn't say paragraph 1a through d. They said the entire paragraph. That's right, but at the end of the paragraph, they didn't say paragraph 1a through d. And why isn't the verb, the adverb, part of the noun in that situation? Because if they wanted to limit it to that class of a to d, that's the easiest thing to have done. Because your counsel is or your adversary is right. If they wanted to limit 1226a to c2, they would have said c2. So a couple of responses, but I think the main one is that the phrase when the alien is released does not modify who the alien is. It takes as a given he's already been fully described. And instead, that just modifies the duty to the secretary. Sotomayor's question, when he's released identifies the alien that the statute is looking at. You by your you say that there's a command that you have to follow. To try to take these people into custody. You say there's a command to do it, but you don't have to do it. You can choose not to do it. I don't know what kind of command that is. But you at least recognize that there's a sense of urgency. You should do this. So why doesn't that describe the noun? So I think three responses. The noun and the verb, I should say. So first, we just don't think it modifies who the alien is at all. Second, even if you think that it does and there is some kind of timing requirement, this Court has said again and again and again that it's better to be late than never. And then a drives us home, right? Because it has two sentences. The first is about arrest and the second is about custody and prohibits. It has the exception for c. And the only provision in c that talks about release is c2. And that's the one that categorically prohibits release. If reasonable amount of time, Justice Breyer's suggestion, were part of a ruling, what do you think is a reasonable amount of time or presumptively reasonable? I know that's not your preferred position, but do you have thoughts on that? I think our main answer is that would be really profoundly problematic because the gaps in custody are often very long. And the basic reason- So therefore, you would say a long period is a reasonable period. But do you have any more meat you want to put on those bones of what a reasonable period of time would be given all the circumstances? I guess I would say that what often happens is once an alien gets out, so I think this comes across in the brief, the alien is often released before DHS is even aware that that's going to happen, is even aware that the person is one of these aliens. And once the person's out, it's going to be much more difficult to track them down. DHS might not know where they live, how to find them. And so what happens sometimes is that DHS doesn't become aware of them again until years later when they get arrested on a different offense. And so I think it's difficult for me to give content to that. I think the force of that argument that maybe it would be different after the passage of some long period of time- The problem is that if they're arrested, if that's the only way you become aware of them, they get arrested, you can hold them. You could do what you should have done the first time, which is to put a detainer on them. Under the ---- I mean, so with Mr. Mone-Priap, we did arrest him just as he got out the second time, but that second offense didn't trigger 1226C. And so he's arguing that because he was out for years and years before he got arrested the second time, that he's off the hook. And I think- Sotomayor, I guess the problem that I have is you're pitting two groups of people. I'm not naysaying that there are people who are released on bail who are dangerous and commit serious crimes. But if I look at the numbers that do that, they're very, very small compared to the people who are released on bail and don't commit more crimes or the number of people who get cancellation of removal for various reasons. At what point do we constitutionally ignore that? We ignore that there's a whole class, huge class of people who are being held where no one would consider them dangerous? Or- You may answer briefly. So none of those numbers are in the record, and I don't think we would agree with them, but just more fundamentally, this is a statutory interpretation case. I think the statute is unambiguous. C2 reaches anybody with the requisite criminal history, and every one of the Respondents has it. So we're asking the Court to reverse. Thank you, Counsel. The case is submitted.